UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-62662-CIV-MARRA

In re:

CERTIFIED HR SERVICES COMPANY,
f/k/a THE CURA GROUP, INC.,

Debtor.
_____/

ADRIENNE HOPKINS and PAUL HOPKINS,

Appellants,

v.

JAMES S. FELTMAN, Liquidating Trustee of
CERTIFIED HR SERVICES LIQUIDATING
TRUST

Appellee.
_____/

**OPINION AND ORDER**

This cause is before the Court on the appeal by Adrienne and Paul Hopkins ("Appellants"). Appellants seek review of the Bankruptcy Court's Memorandum Order ("Memorandum") entering judgment in favor of James S. Feltman, Liquidating Trustee of Certified HR Services Liquidating Trust ("Appellee") against Appellant Adrienne Hopkins for $1,055,003.90 and against Paul Hopkins for $98,000, plus pre-judgment interest calculated through and including the Petition Date [DE 1]. The Court has carefully considered the appeal, the briefs of the parties, the entire record on appeal, and is otherwise duly advised in the premises.

I. **Background**

The underlying adversary proceeding involved the recovery by Appellee of transfers to Appellants in connection with the sale to Certified HR Services Company, f/k/a The Cura Group, Inc. ("Debtor") of all the stock in America's PEO Holdings, Inc. ("APEO").[1] A comprehensive narrative regarding all of the relevant facts is set forth at pages 1-8 of the Memorandum. Where the facts were in dispute, the Memorandum so notes and sets forth the relative positions of the parties. At issue in this appeal is whether the Bankruptcy Court's resolution of the factual disputes was clearly erroneous, and whether the legal conclusions flowing from these facts were erroneous. This Court herein adopts the factual background as set forth in the Memorandum and addresses below the issues presented by Appellants on appeal.

II. **Legal Standard**

The Court reviews the Bankruptcy Court's factual findings for clear error and its legal conclusions *de novo*. In re Globe Manufacturing Corp., 567 F.3d 1291, 1296 (11th Cir. 2009); In re Club Assoc., 951 F.2d 1223, 1228-29 (11th Cir. 1992). An appellate court may affirm the lower court "where the judgment entered is correct on any legal ground regardless of the grounds addressed, adopted or rejected" by the lower court. Bonanni Ship Supply, Inc. v. United States, 959 F.2d 1558, 1561 (11th Cir. 1992).

---

[1] A small portion of the amount sought to be recovered from Appellant Adrienne Hopkins, $150,000, was alleged by her not to have arisen from the sale of APEO. Rather, she alleged that this amount was consideration for a sale of stock that she acquired separately from the consideration received for the APEO sale [DE 48, Trial Tr., vol. 2, 41-43, 120-24, April 8, 2011].

### III. Discussion

**A. The Bankruptcy Court's Finding that APEO had no value when it was sold to Debtor was not clearly erroneous.**

Four of the seven "Issues Presented" in Appellants' Brief [DE 11] are variations of the same issue, namely, whether the Bankruptcy Court's finding that APEO had no value when it was sold to Debtor was clearly erroneous.[2] Although Appellants acknowledge that the Bankruptcy Court's findings of fact must be clearly erroneous to be overturned, they argue that the underlying credible and direct evidence is conflicting, and the more plausible conclusion is that the APEO stock had value when transferred to the Debtor [DE 11, 7].

The Bankruptcy Court undertook a detailed analysis of this conflicting evidence before it concluded that the APEO stock had no value [DE 1, 3-6]. Appellants argue that the Bankruptcy Court failed to explain why the testimony of Thomas Cunningham, APEO's former CFO, was not given any weight by the Court [DE 11, 7]; however, that is not accurate. The Bankruptcy Court specifically stated that the opinions expressed by both Appellant Paul Hopkins and Thomas Cunningham regarding the value of APEO lacked credibility, and found that these witnesses lacked the experience of Appellee's expert witness, Mr. Morriss [DE 1, 9 n.3].

---

[2]Appellants' Issue "1" is "Whether the bankruptcy court's factual finding that APEO had little or no business at the time of the APEO transaction is clearly erroneous?"; Issue "2" is "Whether the bankruptcy court's factual finding that the best reasonable estimate of the value of APEO's assets on November 21, 2011 was zero is clearly erroneous?"; Issue "3" is "Whether the bankruptcy court erred in holding that the Debtor did not receive reasonable equivalent value in exchange for the $310,933.90 transferred to Ms. Hopkins for her ownership interest in APEO?"; and Issue "6" is "Whether the bankruptcy court erred in failing to consider the valuation of APEO evidenced by the March Group Report?" [DE 11, 2-3].

It is the Bankruptcy Court's function as fact finder to assess the credibility of the witnesses. Bankruptcy Rule 8013 provides that "due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses."

Nothing in the Record on Appeal suggests that the Bankruptcy Court's evaluation of the witnesses was clearly erroneous. In fact, the evidence supports the Bankruptcy Court's conclusion. By way of example, Paul Hopkins' determination of APEO's value excluded the health insurance losses that were causing APEO's financial problems [DE 2-7, 32]. When asked why he would exclude the health insurance losses at this stage, he responded, "I think from a marketing standpoint, we were taking ourselves as, if somebody came along and helped us cure this problem, this is what they would be left with." Id.  Excluding a major liability in evaluating the worth of APEO certainly cast serious doubt on Mr. Hopkins' methodology. Mr. Hopkins agreed at trial that he had no professional training or experience as a business valuation appraiser [DE 48, Trial Tr., vol. 2, 109, April 8, 2011]. Mr. Hopkins also testified that $2,000,000 was offered for the APEO stock by a different purchaser. Id. at 90. Absolutely no documentary evidence or testimonial evidence other than that of Mr. Hopkins was introduced to support this contention. Id. at 113.

Although Mr. Cunningham testified at his deposition that he did not believe that the purchase price for APEO was inflated [DE 2-8, 51], there was nothing in Mr. Cunningham's testimony to indicate that he had any experience valuing companies. Id. at 7-9. In fact, he was not the one who calculated the value of APEO at the time of the stock sale. Id. at 63. His role was to "work with the attorneys involved in crafting the purchase agreement." Id. at 20.

In addition to the testimony of Hopkins and Cunningham, Appellants relied at trial upon a

Strategic Options Analysis prepared in 2000 by the March Group, LLC, consultants who were retained when APEO started having financial difficulties. Appellants argue that the Bankruptcy Court "improperly discarded the March Group Report . . . in the misfounded [sic] holding that it was offered as an expert's opinion rather than as fact evidence to rebut Mr. Morris' [sic] testimony." [DE 11, 8]. Appellants go on to argue that the March Group Report had been authenticated as a business record. Id.

Appellants misconstrue the Bankruptcy Court's opinion. There were no issues regarding the authentication of this document. Any such issue would go to the admissibility of the document; however, the Report was admitted into evidence [DE 2-6, DE 48, Trial Tr., vol. 2, 9-13, April 8, 2011]. The Bankruptcy Court, after reviewing the Report, wrote:

> The March Report contains significant opinion testimony concerning the value of APEO in the year 2000. However, the Defendants did not identify an expert witness in this case to testify and support the valuation positions taken in the March Report. None of the authors or individuals associated with the preparation of the March Report testified at trial. The opinions in the March Report therefore lack foundation and are not considered by this Court to be reliable or credible evidence in support of the value of APEO at the time of sale to the Debtor. Moreover, as noted by Mr. Morriss in his testimony at trial, the March Report ignores and fails to account in any way for the more than $1.9 million in losses identified in APEO's year end 2000 financial statement.

[DE 1, 9-10, footnote omitted].

In an attempt to justify Debtor's original $17,500,000 purchase price for APEO, Appellants note that the transaction was an arm's length transaction; it was negotiated by sophisticated counsel on both sides; all appropriate resolutions were signed; the Debtor's principals executed a Due Diligence Statement confirming that they had reviewed the books and

5

records of APEO prior to the purchase; and the Debtor's counsel issued an Opinion Letter confirming that Debtor was authorized to enter into the purchase [DE 11, 5]. While all of these points may be accurate, they do not prove that APEO had value at the time of the transfer. There is no dispute that APEO was in financial trouble. Going forward, it could only be profitable if its expenses and liabilities could be brought under control. Debtor, due to its "Ponzi-like" operations, and other questionable business practices [DE 48, Trial Tr., vol. 1, 224-25, April 7, 2011], was probably the only company that could benefit from operating APEO. As noted by the Bankruptcy Court:

> The Defendants further attempt to point to "synergistic" values allegedly received by the Debtor in return for the Hopkins Transfers. In this regard, the Defendants allege that the Debtor's business was profitable in the year 2002, during which APEO accounted for a significant portion of its revenues. Mr. Hopkins indicated at trial that the Debtor "fixed" APEO's failing business operations by eliminating the COBRA health insurance liabilities plaguing the company to allow the Debtor to generate profits utilizing APEO's client base. . . . While the Debtor did report profits in 2002, . . .this evidence, standing alone, is insufficient to rebut the credible testimony of Mr. Morriss concerning APEO's lack of value at the time of sale. The COBRA liabilities which weighed APEO down appear to have been excised from APEO's ongoing operations and from the balance sheets of the Debtor. The COBRA liabilities consisted of real medical insurance claims, which would have required actual payment in some form by the Debtor in order to resolve. No documentary evidence of the Debtor's cost to "fix" APEO was presented at trial. The Debtor's financial statements for 2001, 2002, and 2003 do not address or reveal the health claims expense. Thus even if the alleged synergies attributed to the acquisition of APEO could be considered by this Court as a yardstick to measure reasonably equivalent value, the Court lacks sufficient evidence to make such a measurement and to calculate any value which the Debtor could allegedly have received from the transfer of Adrienne Hopkins' APEO stock as a result.

[DE 1, 10]. Therefore, the fact that Debtor went through all the normal formalities prior to

acquiring APEO does not constitute competent and credible evidence that APEO had value at the time to any but an unscrupulous company like Debtor.

In contrast to the evidence of value submitted by Appellants, Appellee produced a detailed expert report from Lawrence D. Morriss, Jr. [DE 2-22][3]. Mr. Morriss testified that he arrived at a zero value for APEO on the sale date because

> in generally accepted valuation theory, there are generally three methodologies, the asset method, the income method, the market method, but they all go to earnings and cash. All three of those methodologies are trying to corroborate a value that is based on cash, and in America's PEO case they weren't earning cash, there wasn't a cash flow for the business in 2000 and 2001, and projected into the future as well. So, there – you know, you can't pay your bills with revenue, you can't pay your employees with revenue, you can't pay the light and the insurance with revenue, you can only do it with cash.
>
> So when your assets aren't cash flowing, when your earnings aren't cash flowing, and when your multiples in the market don't have a cash multiple, it's a negative value, or in parlance for generally accept (sic) valuation, it's a zero value.

[DE 48, Trial Tr., vol. 1, 195-96, April 7, 2011]. The Memorandum outlined the salient points in Mr. Morriss' analysis relied upon by the Bankruptcy Court as follows:

> a) APEO experienced rapid growth from its inception. APEO, along with its affiliates managed gross payroll in excess of $20 million in its first year of operation. The $20 million nearly tripled the following year, with the company (and its affiliates) managing almost $60 million in sales. The $60 million increased to just over $112 million by 2000 and came in just over that amount ($113

---

[3]One of the bases for Appellants' objection to the Bankruptcy Court's reliance upon Mr. Morriss' report and testimony is the fact that Mr. Morriss works for the same firm as the Appellee [DE 11, 6-7]. Appellants argue that this creates conflict and credibility issues. Id., at 7. The Bankruptcy Court was aware of this [DE 48, Trial Tr., vol. 1, 218-19, April 7, 2011], and obviously still found Mr. Morriss to be credible. Such a finding was within the purview of the Bankruptcy Court.

million) in the first nine months of 2001.

b) During 1997 through 2001, APEO's expenses increased at a similar, if not greater, rate. The expenses resulted in negative Earnings Before Interest and Taxes ("EBIT") for the company for both years ended 2000 and 2001 which led to its sale to the Debtor.

c) Near the end of 2000, one of APEO's largest clients, Timely Transportation ("Timely") went bankrupt. In addition to APEO losing the revenues associated with Timely, the company was still liable for the insurance coverage for Timely's COBRA participants. APEO's losses due to Timely's bankruptcy were determined by APEO's management to be $1 million dollars or more.

d) Looking for an infusion of capital, the executives of APEO began to approach banks looking for a line of credit. APEO was originally trying to secure a loan in the amount of one-half million dollars, but soon needed a greater amount. The banks were unwilling to extend a line of credit to APEO, due to, among other things, the company's insufficient collateral.

e) Early in 2001, Mr. Hopkins began having discussions with Anthony Huff regarding negotiations for the Debtor to become part-owner of APEO. As these discussions progressed, Mr. Huff became interested in acquiring the entire company. At the time of the APEO transaction, [Debtor][4] had little or no business and its equity shares were trading for $0.03 a share.

f) Ultimately, on November 21, 2001, the Debtor acquired 100% of the issued and outstanding shares of APEO. At the time of the November 21, 2001 transaction, APEO was not a solvent company. APEO's assets were not generating enough cash to sustain the business. The company's audited financial statements for the year ended December 31, 2000 showed that its liabilities exceeded its assets by $1,923,601, indicating that APEO was insolvent from a balance sheet perspective. Moreover, APEO's actual negative EBIT and the projection of negative cash flow in 2001 indicated

---

[4]The Memorandum has the name "APEO" where this Court has substituted the word "Debtor" since this is an obvious scrivener's error. APEO was not a publicly traded company, and the price referred to by the Bankruptcy Court was the price of Debtor's shares. [DE 2-22, 6 ¶ 22]

>  that the value of APEO's assets would not satisfy its obligations, such as its trade and interest-bearing debts, subsequent to November 21, 2001.  Accordingly, the best reasonable estimate of the value of APEO's assets at November 21, 2001 was zero.
>
>  g) Less than one year later, in the fall of 2002, Mr. Huff wanted to renegotiate the original purchase of APEO.  At this time in the insurance industry, PEO businesses were incurring large self-insured deductibles (which created a need for collateral).  At the time, APEO did not have adequate capital, and the need for collateral affected the actual retail value of the company.

[DE 1, 8-9]. It was well within the discretion of the Bankruptcy Court to find Mr. Morriss' report and testimony credible.

Appellants' arguments simply seek to substitute their judgment of the evidence for the Bankruptcy Court's judgment of the evidence.  This Court concludes that the Bankruptcy Court's finding that APEO had no value when it was sold to Debtor was not clearly erroneous and should be upheld on this appeal. Therefore, reasonably equivalent value was not received by Debtor for those payments made by it, and on its behalf, in connection with the purchase of the APEO shares.

**B.  The Bankruptcy Court did not err in holding that the transfers at issue may be avoided and recovered by the Trustee.**

The crux of Appellants' arguments throughout its brief is that equivalent value was received in exchange for all of the transfers at issue. The issue of equivalent value is ultimately the linchpin of the determination in this case whether the transfers should be avoided as constructively fraudulent under 11 U.S.C. § 548(a) and Fla. Stat. § 726.105(1), and whether the Trustee should be permitted to recover the transfers under 11 U.S.C. § 550.

The first two cited statutes permit a trustee to avoid transfers made when an insolvent

debtor receives transfers for less than reasonably equivalent value. Appellants do not challenge the Bankruptcy Court's finding that Debtor was insolvent at all relevant times. Having determined that reasonably equivalent value was not received by Debtor for the APEO stock, the legal conclusion is inescapable that the transfers made to Appellants in connection therewith can be avoided.

Section 550 of Title 11 of the United States Code permits the Trustee to recover avoided transfers from the initial transferee of such transfer or any immediate or mediate transferee of such initial transferee. The Trustee may not recover from a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge that the transfer is voidable, or any immediate or mediate good faith transferee of such transferee.

The Bankruptcy Court held that under 11 U.S.C. § 550(a)(1), Appellant Adrienne Hopkins was the direct recipient of transfers in the amount of $310,933.90 made to her by the Debtor, and she has no further defenses to recovery of the transfers [DE 1, 16]. The Bankruptcy Court further held that under 11 U.S.C. § 550(a)(2), Appellants Adrienne Hopkins and Paul Hopkins stand as subsequent transferees of those transfers made to them by Midwest[5] in the amounts of $743,570 and $96,000 respectively, and since the two Appellants did not give up something of value, they cannot avail themselves of the defenses set forth in 11 U.S.C. §550(a)(2) [DE 1, 16-17].[6]

---

[5] The Bankruptcy Court avoided $109 million dollars transferred from the Debtor to Midwest based upon the Debtor's constructive fraud [DE 1, 15].

[6] The Bankruptcy Court also stated that the evidence "suggests" that Appellants did not accept the transfers in good faith and without knowledge that they could be voided [DE 1, 17].

Appellants raise several arguments to challenge the avoidance and recovery of the APEO transfers. First, they argue that reasonably equivalent value was received by Debtor because the APEO stock was worth at least two million dollars [DE 11, 8]. This Court has already upheld the Bankruptcy Court's findings to the contrary. Appellants also argue that to the extent transfers were made on the note obligations that arose in connection with the sale of the APEO stock, value was received in exchange for the transfers, i.e. the satisfaction or reduction of an outstanding debt obligation [DE 11, 10]. The Court rejects this argument. If, as has been determined, the note was transferred without the receipt of property of reasonably equivalent value, payments on the note necessarily suffer from the same infirmity.

Appellants concede that all but two of the payments at issue in this appeal were received by them for the sale of the APEO stock [DE 48, Trial Tr., vol. 2, 41, April 8, 2011]. Appellants allege that these two payments, totaling $150,000, were consideration for a sale of Certified stock that Adrienne Hopkins acquired separately from the consideration received for the APEO sale [DE 48, Trial Tr., vol. 2, 41-43, 120-24, April 8, 2011]. The Bankruptcy Court noted that

> [e]vidence and testimony from Mr. Hopkins and Mrs. Hopkins demonstrated that the two payments were based on a stock purchase agreement executed by Adrienne Hopkins and MS Arden, Inc. (a non-debtor third party) whereby Ms. Hopkins sold 216,666 (50,000 + 166,666) shares of Certified Services, Inc. for approximately 69 cents a share totaling an aggregate sale price of $150,000 which was paid to Ms. Hopkins via the two transfers. Mr. Hopkins further testified that at the time Ms. Hopkins sold the shares to MS Arden, Inc., Certified shares were trading for

---

Having found that Appellants did not take for value, this additional finding was unnecessary, and this Court does not opine on those findings or comment on arguments raised by Appellants relative thereto.

approximately $1.00 per share.

[DE 1, 11-12]. Despite the fact that this sale allegedly was made to MS Arden, Inc., the payment for the stock came from Midwest. When asked why this occurred, Adrienne Hopkins testified that she did not know [DE 48, Trial Tr., vol. 2, 123, April 8, 2011], and Paul Hopkins testified that they assumed that Midwest had brokered the deal. Id. at 43.

While Appellant Adrienne Hopkins may have given property with value during this transfer, the property with value was given to MS Arden, Inc., not to Midwest. She, therefore, failed to meet one of the requirements of 11 U.S.C. § 550 (a)(2), and the amount she received from Midwest for this transfer can be recovered by the Trustee.[7]

The Bankruptcy Court held that the transfers to Appellant Paul Hopkins were recoverable by the Trustee because he gave nothing of value in return for the transfers [DE 1, 17].[8] The testimony was that the checks issued to Appellant Paul Hopkins were, in fact, checks that should have been issued to Appellant Adrienne Hopkins and were endorsed over to her by her husband [DE 48, Trial Tr., vol. 2, 60-61, April 8, 2011]. Whether the checks had been issued to Adrienne or Paul, the legal conclusion is the same that nothing of value was given for the transfers. All of these transfers are recoverable by the Trustee.[9]

---

[7] As noted above in footnote 6, it is unnecessary for the Court to opine on the other parts of 11 U.S.C. §550(a)(1) having found that the Appellants did not take for value.

[8] At trial, there was testimony that one check to Paul Hopkins for $2,500 constituted a winter bonus paid by Debtor in the ordinary course of business. At trial, Counsel for the Trustee stated that the Trustee was not seeking to avoid that payment [DE 48, Trial Tr., vol. 2, 41, April 8, 2011]. This amount was not part of the judgment of the Bankruptcy Court and no party has appealed from that finding.

[9] It is similarly unnecessary for the Court to opine on the other parts of 11 U.S.C. § 550(a)(1).

The Bankruptcy Court also held that $153,665 worth of transfers could be avoided by the Trustee as preference transfers to Appellant Adrienne Hopkins under 11 U.S.C. § 547 [DE 1,17-19]. These are the same transfers that were discussed above. Inasmuch as all of the transfers can be avoided under 11 U.S.C. § 548(a) and Fla. Stat. § 726.105(1), the Court finds it unnecessary to address this alternative theory of recovery or any objections thereto in the parties' briefs.

**C. The Bankruptcy Court did not err in finding that the single satisfaction requirement was not violated with respect to the Midwest Transfers.**

Appellants object that the Trustee's claims as to those sums paid to Appellants by Midwest should have been disallowed under the single satisfaction rule of 11 U.S.C. § 550(d), since the Trustee previously sued Midwest for fraudulent transfers relating to the Debtor and settled that action. Appellants further argue that the ruling in In re Prudential of Florida Leasing, Inc. v. Northern Trust Bank of Florida, N.A., 478 F.3d 1291 (11th Cir. 2007) required the Bankruptcy Court to allocate some portion of the Midwest settlement to the transfers from Midwest to Appellants.

Appellee responds by pointing out that the Midwest settlement specifically stated that no portion of the settlement proceeds would be allocated to any of the Trustee's avoidance claims; therefore, there would be no double recovery. As noted in Prudential, however, that is not necessarily the end of the inquiry, since a "transferee should not be bound by the settling parties' self-serving allocation." 478 F.3d at 1302.

Section 550(d) of Title 11 of the United States Code provides that a trustee is entitled to only a single satisfaction under 11 U.S.C. §550(a). Therefore, to the extent that the Trustee recovered amounts from Midwest in satisfaction of its claims relative to the transfers to

Appellants, the Trustee would be barred from recovering these amounts from Appellants.

The Bankruptcy Court notes that the Trustee had filed a separate action against Midwest in 2005 in order to avoid in excess of $108 million dollars in transfers to Midwest [DE 1, 6 ftn. 1].[10] In response to Appellants' assertion of a double recovery, the Bankruptcy Court noted that the Trustee voluntarily dismissed the adversary proceeding against Midwest in May, 2006 [DE 1, 17 ftn. 9]. Prior to this dismissal, however, there was a settlement agreement to which Midwest was a party [DE 2-35]. The Court has reviewed that settlement agreement in light of the Prudential case.

The settlement agreement was between the Trustee and a number of individuals and entities, including Midwest [DE 2-35]. In this settlement agreement, Midwest agreed to assign and transfer to the Trustee its right to enumerated litigation claims [DE 2-35, 7-8]. There were no payments made by Midwest to the Trustee. The settlement agreement provides:

> Notwithstanding anything herein to the contrary, the parties hereto acknowledge and agree that the consideration paid by Midwest . . . pursuant to this Agreement is in settlement of those claims asserted against Midwest . . . by the Trustee unrelated to claims and causes of action accrued in favor of the Consolidated Estate against Midwest . . . and any subsequent transferees of Midwest . . . under and pursuant to chapter 5 of the Bankruptcy Code (the "Avoidance Claims"), which Avoidance Claims are hereby preserved in and in favor of the Trustee for the benefit of the Consolidated Estate . . . . Specifically and for avoidance of doubt, none of the consideration paid or proposed to be paid by Midwest . . . shall be, or is being, allocated to the Avoidance Actions or recoveries thereon, or any

---

[10] The Bankruptcy Court cites to Adversary Case No. 07-1326; however, the Trustee brought two separate cases against Midwest. The first one, brought in 2005, was Adversary Case No. 05-2110. That case was settled and then dismissed as to Midwest in 2006. The Trustee later commenced a second case against Midwest in May, 2007, Adversary Case No. 07-1326, which was dismissed in October, 2011. There is no evidence before the Court that any settlement was reached in the second case.

> claims of [sic] causes of action under or pursuant to Chapter 5 of the Bankruptcy Code presently or hereafter available to any party hereto. Notwithstanding anything herein to the contrary, the Trustee agrees and covenants not to sue Midwest . . . for or in respect of the Avoidance Claims . . . .

[DE 2-35, 10-11]. To assist the Trustee in pursuing the Avoidance Claims, Midwest agreed to provide documentation and/or explanations as requested by the Trustee to enable the Trustee to confirm the disposition of the Midwest transfers. In fact, if the Trustee was not satisfied with such documentation and explanations, he had the right to terminate the settlement agreement [DE 2-35, 13].

The facts in Prudential are distinguishable from the instant case. In Prudential, the settlement agreement avoided the transfers that were then asserted against the transferee in the adversary complaint. The only issue that remained in Prudential was the method to be used to allocate the settlement from the first action to the second adversary proceeding.

Here, there is no evidence that the settlement agreement avoided the relevant transfers. To the contrary, the claims were preserved, with Midwest obligating itself to assist the Trustee in its recovery efforts. Finding no support in the record or the case law for Appellants' argument that the single satisfaction requirement was violated, the Court rejects this argument and upholds the Bankruptcy Court's decision in this regard.

### IV. Conclusion

Based upon the foregoing, it is **ORDERED AND ADJUDGED** that the decision on appeal of the Bankruptcy Court **[DE 1]** is **AFFIRMED**. This case is **CLOSED**, and all pending

motions are **DENIED** as moot.

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 25th day of September, 2012.

                                                                  _____
                                                                  KENNETH A. MARRA
                                                                  United States District Judge